### UNITED STATES DISTRICT COURT FOR THE
### MIDDLE DISTRICT OF PENNSYLVANIA

MARIA CONCEPCION ESPI LEON,    :
                                  :

                Plaintiff          :      No. 3:15-CV-1375
                                  :

                   vs.            :      (Judge Nealon)
                                  :

CAROLYN W. COLVIN, Acting      :
Commissioner of Social Security,    :

               Defendant     :

**FILED**
**SCRANTON**
DEC 1 9 2016

PER _____
DEPUTY CLERK

### <u>MEMORANDUM</u>

On July 15, 2015, Plaintiff, Maria Concepcion Espi Leon, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 1461, <u>et seq.</u> (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's application for DIB will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

Plaintiff protectively filed[2] her application for DIB on August 27, 2012, alleging disability beginning on February 29, 2010, due to a combination of a right rotator cuff injury, tendonopathy of the right shoulder, diabetes mellitus, hyperlipidema, and hypertension. (Tr. 14, 63-64, 424).[3] These claims were initially denied by the Bureau of Disability Determination ("BDD")[4] on October 24, 2012. (Tr. 14). On November 1, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 14). Oral hearings were held on February 25, 2014, and April 14, 2014, before administrative law judge Reana Sweeney, ("ALJ"), and impartial vocational expert Andrew Caporale, ("VE"), and her alleged date of disability was amended to March 29, 2010. (Tr. 14, 62). On May 15, 2014, Plaintiff filed a request for review with the Appeals Council. (Tr. 7). On June 4, 2015, the Appeals Council concluded that there was no basis upon

---

2. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on December 21, 2015. (Doc. 10).

4. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

which to grant Plaintiff's request for review. (Tr. 1-6). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on July 15, 2015. (Doc. 1). On December 21, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 9 and 10). Plaintiff filed a brief in support of her complaint on February 2, 2015. (Doc. 11). Defendant filed a brief in opposition on March 4, 2015. (Doc. 12). Plaintiff filed a reply brief on March 21, 2014. (Doc. 13).

Plaintiff was born in Mexico on March 29, 1960, and at all times relevant to this matter was considered "an individual closely approaching advanced age."[5] (Tr. 398). Plaintiff did not graduate from high school or obtain her GED, and cannot communicate in English. (Tr. 423, 425). She moved to the United States of America in 2002. (Tr. 65). Her employment records indicate that she previously worked as a laborer and packer in a factory. (Tr. 417). The records of the SSA reveal that Plaintiff had earnings in the years 2003 through 2010. (Tr. 217). Her annual earnings range from a low of two thousand twenty dollars and ninety-eight cents ($2,020.98) in 2010 to a high of nineteen thousand seven

_____

5. "Person closely approaching advanced age. If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(d).

hundred fifty-seven dollars and ninety-five cents ($19,757.95) in 2008. (Tr. 217). Her total earnings during these seven (7) years were ninety thousand nine hundred eighty-four dollars and seventy-five cents ($90,984.75). (Tr. 217).

In a document entitled "Function Report - Adult" filed with the SSA on September 18, 2012, Plaintiff indicated that she lived in a house with her family. (Tr. 404). From the time she woke up to the time she went to bed, Plaintiff would watch television, clean her house, and try to rest. (Tr. 405). She had no problems with personal care tasks such as dressing and bathing, was able to prepare only basic meals on a daily basis, was able to shop for food and clothes once a week, and was able to do house work, though she did not indicate what type of house work. (Tr. 404-407). She was unable to drive a car. (Tr. 407). She was able to walk for three (3) blocks before needing to stop and rest for ten (10) minutes before resuming walking. (Tr. 409). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, seeing, or getting along with others. (Tr. 409).

Regarding concentration and memory, Plaintiff did not need special reminders to take care of her personal needs, take her medicine, or attend her appointments. (Tr. 406, 408). She could pay bills, handle a savings account, use a checkbook, and count change. (Tr. 407). She could pay attention for two (2)

4

hours, could follow written and spoken instructions "very well," was able to finish what she started, and was "average" at handling stress and changes in routine.  (Tr. 409-410).

Socially, Plaintiff left her house two (2) days a week.  (Tr. 407).  Her hobbies included reading and watching television.  (Tr. 408).  She spent time with others both in person and on the telephone daily.  (Tr. 408).  She went to church on a weekly basis.  (Tr. 408).  She did not have problems getting along with family, friends, neighbors, or others.  (Tr. 409).  She has experienced no changes in social activities since her illnesses, injuries, or conditions began.  (Tr. 409).

Plaintiff also completed a Supplemental Function Questionnaire for pain.  (Tr. 412-413).  She indicated that an accident caused her to experience pain in her right shoulder, arm, and hand; that her pain was constant and created numbness in her fingers; that all activities caused her to experience pain in this area; that her pain was the same all day and night; that medication relieved her pain for about three (3) hours; that her medication caused her to feel sleepy; that she attended physical therapy for four (4) months; and that she took hot showers for pain relief.  (Tr. 412-413).

At her oral hearing on April 14, 2014, with a Spanish interpreter present, it was initially clarified that, based on the prior oral hearing held on Feburary 25,

2014, the supervisors at Plaintiff's prior places of employment spoke both Spanish and English, and that her co-workers spoke mostly Spanish. (Tr. 31). Plaintiff testified that she was disabled due to a combination of a right should impairment, diabetes, (Tr. 31, 36, ).   With regards to her right should impairment, she testified that she had undergone two (2) surgeries, one on April 13, 2010 and one on July 12, 2011. (Tr. 32). Plaintiff indicated that, after both surgeries, she attended physical therapy. (Tr. 32-33). She testified that, at the time of the hearing, she was experiencing a "lot of pain" in her right shoulder and accompanying lack of strength in her right arm. (Tr. 34). She indicated that she did what she could with her left arm, and what she could not do, she would have her children help her, including activities such as combing her hair, getting dressed, cleaning, lifting heavy objects that weighed more than a gallon of milk, such as a heavy pot, opening the door, and shopping for groceries. (Tr. 41-46). She clarified that she was unable to vacuum, dust, or stir a pot with her right arm. (Tr. 44, 46). She was unable to reach overhead or forward with her right upper extremity due to the pain these movements caused, and that the pain radiated down her right arm into her fingers. (Tr. 42-43). She indicated that her pain caused difficulty with concentration due to medication that made her drowsy. (Tr. 46). She also stated she had difficulty sleeping due to pain, which caused her to need to nap during the

day. (Tr. 46-47). She was unable to take Vicodin for pain because it caused nausea. (Tr. 44). She indicated that physical therapy did not bring her relief. (Tr. 44).

Regarding her diabetes, she stated she took insulin, ate three (3) meals a day, and checked her blood sugar two hours after every meal. (Tr. 35-37, 41). She indicated that she could walk half a mile. (Tr. 37).

In terms of daily activity, Plaintiff stated that in the summer of 2010, she woke up at six (6) in the morning, got her daughter ready for school and made her school lunch, went for a walk, cleaned her house, took her blood sugar, ate lunch, cleaned the house some more, exercised, helped her children with their homework, ate dinner, watched television, and went to bed. (Tr. 38-40).

## MEDICAL RECORDS

### A.   Right Rotator Cuff Impairment

On April 14, 2010, Plaintiff underwent an arthroscopy, acromioplasty, and mini open repair of her rotator cuff of her right shoulder due to a "full thickness tear involving the anterolateral aspect of the supraspinatus tendon." (Tr. 454-455). It was noted that her pain was located in the top of her shoulder and radiated down the side of her arm, and was worsened when twisting her arm. (Tr. 454). Her physical examination before the surgery revealed a normal active range of motion,

pain when her should reached ninety (90) degrees, pain with resisted flexion at ninety (90) degrees and abduction to one hundred thirty (130) degrees, very painful resisted abduction, a positive impingement test, a negative apprehension test, great tenderness over the greater tuberosity, and slight crepitus and snapping of the right shoulder with motion.  (Tr. 454).

On April 20, 2010, Plaintiff had an appointment with Dr. Richards after her rotator cuff surgery on her right shoulder.  (Tr. 489).  It was noted that Plaintiff was doing well overall, had some pain, had decreased range of motion, had difficulty sleeping at night, and that she was to begin gentle range of motion exercises at home.  (Tr. 488).

On May 17, 2010, Plaintiff had a follow-up appointment with Dr. Richards. (Tr. 489).  It was noted that her shoulder was doing well, that she was in moderate discomfort, that there was minimal swelling, that she could elevate her arm to ninety-five (95) degrees with some discomfort, that she could abduct to eighty-five degree, that she had normal extension and rotation, and that her shoulder would continue to improve over many months.  (Tr. 489).

On June 21, 2010, Plaintiff had an appointment with Dr. Richards.  (Tr. 488).  Plaintiff reported that she still had moderate discomfort with her shoulder. (Tr. 488).  A physical examination of her right shoulder revealed that she had no

8

swelling, could elevate her arm to one hundred ten (110) degrees with discomfort, could abduct to ninety (90) degrees, and had normal rotation. (Tr. 488). Dr. Richards noted he felt Plaintiff had inflammation of the subdeltoid bursa, and injected this area with Marcaine and Kenalog. (Tr. 488). It was also noted that Plaintiff would continue with physical therapy. (Tr. 488).

On July 19, 2010, Plaintiff had an appointment with Dr. Richards. (Tr. 488). It was noted Plaintiff still had some discomfort, but was improving. (Tr. 488). A physical examination of her right shoulder revealed that she could forward elevate her right arm to one hundred twenty (120) degrees, abduct to ninety (90) degrees, had improving rotation, and had tenderness over the top of her shoulder joint. (Tr. 488). Dr. Richards told Plaintiff that her should would gradually improve, and that she should stop physical therapy for a month to give her right shoulder a rest. (Tr. 488).

On August 30, 2010, Plaintiff had an appointment with Dr. Richards. (Tr. 487). It was noted that her shoulder was doing well, and that she had taken time off from therapy, which seemed to have helped. (Tr. 487). A physical examination of her right shoulder revealed she could forward elevate to one hundred fifty (150) degree, had discomfort when reaching overhead, had difficulty reaching behind her back, and had minimal swelling. (Tr. 487). Plaintiff was

9

instructed to resume physical therapy to "obtain some better motion of the shoulder." (Tr. 487).

On October 20, 2010, Plaintiff had a follow-up appointment with Dr. Richards. (Tr. 487). It was noted that her right shoulder was doing better despite some discomfort. (Tr. 487). A physical examination of Plaintiff's right shoulder revealed she could forward elevate to one hundred sixty (160) degrees and abduct to one hundred fifty (150) degrees, had difficulty reaching behind her back, and there was no swelling. (Tr. 487). Dr. Richards encouraged Plaintiff to continue with her motion exercise program, and noted she was continuing to improve. (Tr. 487).

On January 1, 2011, Plaintiff had an appointment with Dr. Richards. (Tr. 487). It was noted that Plaintiff's right shoulder was doing a little bit better, but that Plaintiff still had moderate discomfort. (Tr. 487, 486). Her examination revealed that her right shoulder had fairly good motion, a forward elevation to one hundred sixty (160) degrees and abduction to one hundred fifty (150) degrees, and no swelling. (Tr. 487). It was noted that she had not returned to work because she had been "laid off." (Tr. 486).

On April 4, 2011, Plaintiff had an appointment with Dr. Richards for a one-year follow-up of her initial right rotator cuff repair. (Tr. 486). It was noted that

10

her should was doing well, but that Plaintiff still had some discomfort. (Tr. 486). A physical examination of her right shoulder revealed that she could forward elevate and abduct to one hundred seventy (170) degrees, had a little bit of difficulty with internal rotation, was slightly tender over the greater tuberosity, had occasional numbness in the fourth and fifth fingers, and had tendonitis with bursitis of the right shoulder. (Tr. 486). She was injected into the subacromial space with Marcaine and Kenalog, and was scheduled for a follow-up in six (6) weeks. (Tr. 486).

On May 2, 2011, Plaintiff had a follow-up appointment with Dr. Richards. (Tr. 486). Plaintiff reported that her shoulder was doing "much better," that she had little pain, and that the injection at the prior visit helped a "great deal." (Tr. 486). A physical examination of her right shoulder revealed normal motion of the shoulder, full extension and abduction to one hundred eighty (180) degrees, and improved rotation. (Tr. 486). Dr. Richards instructed Plaintiff to continue with gentle strengthening. (Tr. 486).

On June 1, 2011, Plaintiff had an appointment with Dr. Richards for discomfort of her right shoulder that was causing difficulty with overhead reaching, and activities such as stirring a pot and ironing her clothes. (Tr. 485). A physical examination of her right shoulder revealed to could elevate forward to

one hundred sixty (160) degrees with discomfort and abduct to one hundred fifty (150) degrees with some discomfort, and that she had tenderness without swelling over the greater tuberosity. (Tr. 485). Dr. Richards ordered an MRI of Plaintiff's right shoulder, and scheduled a follow-up visit. (Tr. 485).

On June 8, 2011, Plaintiff underwent an MRI of her right shoulder due to right shoulder pain. (Tr. 464). The MRI revealed a full-thickness tear in the right supraspinatus tendon. (Tr. 464).

On June 15, 2011, Plaintiff had a follow-up appointment with Dr. Richards. (Tr. 485). It was communicated to Plaintiff that she had a recurrent full thickness tear of the supraspinatus tendon, which explained her right shoulder discomfort. (Tr. 485). A physical examination of her right shoulder revealed tenderness over the greater tuberosity, and Plaintiff was scheduled for a second repair of her right rotator cuff tear. (Tr. 485).

On July 12, 2011, Plaintiff underwent a second surgery to repair a right shoulder rotator cuff tear verified via MRI. (Tr. 458). Plaintiff reported that, after her initial surgery, she continued to experience pain in her right shoulder that increased when reaching overhead, and popping and snapping in her right shoulder. (Tr. 460). Her physical examination prior to surgery revealed a decreased grip strength in her right hand, a decreased range of motion in her right

12

shoulder due to pain, a positive impingement test, normal muscle tone, and 5/5 strength bilaterally. (Tr. 459).

On July 21, 2011, Plaintiff had a follow-up appointment with physician's assistant Trinell Genga after her right shoulder rotator cuff repair surgery. (Tr. 484). It was noted that Plaintiff still had "some pain," but was slowly improving. (Tr. 484). She was enrolled in physical therapy, and was encouraged to start doing gentle flexion and extension exercises two (2) to three (3) times a day. (Tr. 484).

On July 25, 2011, Plaintiff had an appointment with Dr. Richards for a rehabilitation assessment for her right shoulder. (Tr. 508). Upon physical examination of her right shoulder, it was revealed that her strength was a three (3) out of five (5) and that she failed the Apley's scratch test indicating a non-functional arm below ninety (90) degrees. (Tr. 509). Plaintiff reported that her pain was at a seven (7) out of ten (10) over the "AC joint and the superior shoulder," a six (6) out of ten (10) ove rthe lateral arm with activity and certain positions of the shoulder, and a zero (0) out of ten (10) when not moving her arm. (Tr. 509).

On August 12, 2011, Plaintiff had a follow-up with Dr. Richards. (Tr. 484). It was noted Plaintiff's shoulder was doing well, and that she had moderate discomfort. (Tr. 484). Her physical examination revealed she could elevate her

13

arm to one hundred twenty (120) degrees and abduct to ninety (90) degrees and that she had a normal rotation. (Tr. 484). Dr. Richards opined that Plaintiff's shoulder was doing well, was progressing nicely, and that therapy seemed to be helping a great deal. (Tr. 484).

On September 14, 2011, Plaintiff had an appointment with Dr. Richards for a follow-up after her second repair of the recurrent rotator cuff in her right shoulder. (Tr. 483). It was noted that Plaintiff was doing better, had less pain, and that therapy seemed to be helping. (Tr. 483). Her physical examination revealed she could forward elevate to one hundred sixty (160) degrees and abduct to one hundred twenty (120) degrees, had difficulty with external rotation, and had normal internal rotation. (Tr. 483). Plaintiff was instructed to continue with her therapy and exercise program. (Tr. 483).

On September 26, 2011, Plaintiff had an appointment with Dr. Richards for a rehabilitation assessment for her right shoulder. (Tr. 506). Upon physical examination of her right shoulder, it was revealed that flexion was one hundred one (101) degrees, abduction was ninety-four (94) degrees, and her strength was a three (3) out of five (5). (Tr. 507). Plaintiff reported that her pain was at a seven (7) out of ten (10) constantly, and with movement, it was a ten (10) out of ten (10). (Tr. 507).

14

On October 26, 2011, Plaintiff had an appointment with Dr. Richards. (Tr. 483). It was noted that her right shoulder was somewhat better, and that Plaintiff had stopped physical therapy, which was "fine" with Dr. Cohen. (Tr. 483). Her physical examination revealed she had fairly normal range of motion of her right shoulder, could forward elevate it to one hundred sixty (160) degrees and abduct to one hundred sixty (160) degrees, and had some discomfort with extremes of motion. (Tr. 483). She was instructed to continue with her exercise program, and was reassured that she would continue to improve. (Tr. 483).

## B.   Medical Opinions

On August 26, 2010, David Baker, M.D., performed an independent medical evaluation of Plaintiff. (Tr. 527-530). Plaintiff's self-reported symptoms included pain in her right shoulder with motion, difficulty with right upper extremity overhead motion, and pain and difficulty when reaching with her right upper extremity. (Tr. 528). A physical examination of her right upper extremity revealed: active forward flexion to one hundred sixty (160) degrees; external rotation to sixty (60) degrees; internal rotation to fifteen (15) degrees; abduction to one hundred twenty (120) degrees; good rotator cuff strength in the supraspinatus, infraspinatus and subscapularis; no evidence of instability; and 5/5 strength in all muscle groups. (Tr. 529). He opined that, because she had significant

15

postoperative restricted motion and stiffness that could take six (6) to eight (8) months to improve, Plaintiff was capable of "light duty now with restrictions of using her right arm at waist level." (Tr. 529).

On September 24, 2012, Dr. Cohen opined that Plaintiff could occasionally carry up to three (3) pounds due to pain and weakness in her right upper extremity; could stand, walk, and sit for up to two (2) hours in an eight (8) hour workday due to fatigue; was limited in pushing and pulling with her right arm; could occasionally bend, kneel, stoop, crouch, balance, and climb; had limitations with reaching, handling, and fingering in her right upper extremity and hand; and had environmental restrictions. (Tr. 478-479).

On October 3, 2012, Dr. Richards opined that Plaintiff could frequently lift and/ or carry up to ten (10) pounds; could occasionally lift and/ or carry up to twenty-five (25) pounds; had no limitations with standing, walking, or sitting; was limited in pushing and pulling in her right shoulder; had no environmental or postural limitations; and was limited in reaching with her right arm. (Tr. 500-501).

On October 23, 2012, Dilip S. Kar, M.D., a non-examining, state agency physician opined that, based on the record, Plaintiff could occasionally lift and/ or carry twenty (20) pounds; frequently lift and/ or carry ten (10) pounds; stand,

16

walk, and sit for about six (6) hours in an eight (8) hour workday; engage in unlimited pushing and pulling within the aforementioned weight restrictions; and had no postural, manipulative, visual, communicative, or environmental restrictions. (Tr. 81-82). He further opined that Plaintiff should be restricted to light duty work. (Tr. 83).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

17

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one through four."  Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2011. (Tr. 16). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her amended alleged onset date of March 29, 2010. (Tr. 16).

At step two, the ALJ determined that Plaintiff suffered from the severe[6]

---

6. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other

combination of impairments of the following: "Diabetes and Right Shoulder Impairment (20 C.F.R. 404.1520(c))." (Tr. 16).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Tr. 17).

At step four, the ALJ determined that Plaintiff had the RFC to perform less than a full range of medium work with limitations. (Tr. 17-20). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, [Plaintiff] had the [RFC] to perform a less than full range of medium work as defined in 20 CFR 404.15679(c) in that [Plaintiff] is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently with her right upper extremity. [Plaintiff] is right-hand dominant. She must avoid use of hand levers or cranks with her right upper extremity. She cannot climb ropes, ladders, scaffolds, or poles. She is limited to occasional overheard reaching with her right upper extremity. She is capable of tolerating occasional exposure to extreme cold. She must avoid work in high, exposed places. She must avoid work with large vibrating objects, hazardous machinery, sharp objects, and toxic chemicals with her right upper extremity.

---

evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

> [Plaintiff] is able to communicate in English in a manner
> consistent with her past work, although she must avoid work
> that requires her to read or write in English. [Plaintiff] requires
> normal breaks, defined as 10-15 minute break before and after
> a 30-minute mid-shift break, as well as one or two 5-10
> unscheduled restroom or drink breaks.

(Tr. 17).

At step five of the sequential evaluation process, the ALJ determined that

Plaintiff "was capable of performing past relevant work as a Hand Packager, as

actually performed by the claimant and customarily performed in the national

economy. This work did not require the performance of work-related activities

precluded by the claimant's residual functional capacity (20 CFR 404.1565)." (Tr.

20).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between March 29, 2010, the amended

alleged onset date, and the date last insured, December 31, 2011. (Tr. 21-22).

## DISCUSSION

On appeal, Plaintiff asserts that: (1) the ALJ's conclusion that she could

perform past relevant work as a hand packer is not supported by substantial

evidence; (2) Plaintiff is disabled at Step Five because she met all the

requirements of Medical Vocational Rule 202.09; (3) the ALJ failed to apply the

correct legal standard in determining Plaintiff's credibility; and (4) the ALJ's RFC

assessment failed to include all the limitations established by the evidence as required by SSR 96-8. (Doc. 11, pp. 8-13) . Defendant disputes these contentions. (Doc. 12, pp. 8-25).

This Court examines Plaintiff's overarching argument that substantial evidence does not support the ALJ's RFC determination that Plaintiff could perform less than a full range of medium work because this conclusion was unsupported by the medical record. (Doc. 11, pp. 12-13). More specifically, Plaintiff states, "[e]very doctor who gave an opinion limited [Plaintiff] to light work or less." (Id. at 12). The terms light and medium work are defined in the regulations of the Social Security Administration as follows:

> (b) *Light work.* Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work.* Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If

> someone can do medium work, we determine that he or she
> can do sedentary and light work.

See 20 C.F.R. §§ 404.1567 and 416.967.   The United States District Court for the

Eastern District of Pennsylvania addressed a factually similar case in Herbert v.

Sullivan, 1993 U.S. Dist. LEXIS 1931, at *8-9 (E.D. Pa. Jan. 28, 1993), stating the

following:

> To be deemed capable of performing "medium work," plaintiff
> must be capable of lifting up to 50 pounds occasionally and up
> to 25 pounds frequently.  See 20 C.F.R. § 404.1567(c).  The
> ALJ here made no finding that plaintiff is capable of lifting up
> to 50 pounds occasionally and up to 25 pounds frequently.  He
> only found that plaintiff is capable of lifting up to 30 pounds to
> shoulder level, without regard to frequency or duration.  That
> plaintiff was not found capable of lifting 50 pounds
> occasionally is not dispositive of whether plaintiff can perform
> "medium work."  In this regard, the Secretary has recognized
> that in determining whether an individual is capable of
> performing "medium work," "being able to do frequent lifting
> or carrying of objects weighing up to 25 pounds is often more
> critical than being able to lift up to 50 pounds at a time."  SSR
> 83-10 at *6.  What is dispositive, however, is that the ALJ
> made no finding that plaintiff is capable of lifting up to 25
> pounds frequently.  Nor is there any evidence of record that
> sheds light on this point, other than the report from plaintiff's
> treating physician, which was not credited by the ALJ, and the
> "suspect" residual functional capacity reports.  On this record,
> then, there is not sufficient evidence to conclude that plaintiff
> is or is not capable of lifting up to 25 pounds frequently.
> Accordingly, there is not sufficient evidence upon which to
> determine whether plaintiff is or is not disabled.  I will
> therefore remand to the ALJ to make findings concerning the
> frequency with which plaintiff can lift up to 25 pounds and
> whether plaintiff is actually capable of performing at least

substantially all of the activities of the "medium work" level.

Herbert v. Sullivan, 1993 U.S. Dist. LEXIS 1931, at *8-9 (E.D. Pa. Jan. 28, 1993).

In addressing Plaintiff's argument, this Court closely examined the medical record and opinions rendered in relation to Plaintiff's right shoulder impairment, and concludes that, while it is the ALJ's responsibility to decide a claimant's RFC, the ALJ is not permitted to make speculative inferences or substitute his or her own lay opinion in place of the medical ones rendered.  See 20 C.F.R. § 404.1546; Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion.  Id.  An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility."  Id.  As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong."  Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

No single medical opinion concluded that Plaintiff would be able to frequently lift and/ or carry twenty-five (25) pounds.  The most Plaintiff would be

frequently able to lift and/ or carry as opined by several physicians was ten (10) pounds. (Tr. 81-82, 478-479, 500-501). In accordance with the aforementioned opinion rendered by the Eastern District, because there is not sufficient medical evidence to conclude that plaintiff is capable of lifting up to twenty-five (25) pounds frequently, there is not sufficient evidence upon which to uphold the finding that Plaintiff is capable of performing medium work, even if it is "less than the full range;" rather, the ALJ seemingly rendered his own lay opinion in place of the medical ones provided. "Being able to do frequent lifting or carrying of objects weight up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time." SSR 83-10 at *6. Furthermore, the medical opinions all limited Plaintiff to light work, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." See 20 C.F.R. §§ 404.1567 and 416.967. As such, it appears that the weight restrictions the ALJ's RFC determination places on Plaintiff are in accordance with light work, not medium work, and the ALJ overreached his authority to determine Plaintiff's RFC when she substituted her own opinion for that of the medical ones rendered.

As such, upon review of the entire record and the ALJ's RFC determination, it is determined that substantial evidence does not support the ALJ's RFC

determination that Plaintiff can perform less than the full range of medium work.

Therefore, remand on this basis is necessary, and this Court declines to address

Plaintiff's remaining assertions.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined

that the Commissioner's decision is not supported by substantial evidence.

Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision

of the Commissioner will be vacated, and the matter will be remanded to the

Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: December 15, 2016

/s/ William J. Nealon
**United States District Judge**